CASE 45.—JAMES HARGIS WAS TRIED FOR MURDER, RESULTING IN A HUNG JURY, AND THE COMMONWEALTH APPEALS. QUESTIONS OF LAW DECIDED January 18.

# Commonwealth v. Hargis

Appeal from Fayette Circuit Court.

1. Homicide—Principals—Accessories Before the Fact.—Under the statutes of the State which do not create or describe the crime of murder, or mention aiders and abettors or principals in the first or second degree, but merely fix the punishment for murder, and do not define the penalty for an accessory before the fact, but provide by Ky. Stats., 1903, section 1128, that, in all felonies, accessories before the fact shall be liable for the same punishment as principals, and may be prosecuted jointly with principals, or severally, though the principal be not taken or tried, the principal actor, the aider and abettor, and the accessory before the fact are all principals in the first degree, and may be accused and convicted as such.

2. Same—Indictment—Charging One with Being an Accessory.—Under Crim. Code. Prac., section 122, declaring that an indictment shall contain a statement of the acts constituting the offense in ordinary language in such manner as to enable a person of common understanding to know what is intended, and section 126, providing that an indictment must charge but one offense, but, if it may have been committed in different modes and by different means, the indictment may allege the modes and means in the alternative, where the indictment charges that H and others, in connection with J. and B., unlawfully, willfully, and with malice aforethought shot and killed C., and that prior to such time such persons entered into a conspiracy to kill and murder C., and pursuant thereto J. and B., with the knowledge and consent, and by

the direction and procurement of H. and said others, did unlawfully, willfully, and with malice aforethought shoot and kill C., and that, before the time of said murder, said H. and others did unlawfully, willfully, and with malice aforethought advise, incite, procure, and persuade said J. and B. to so shoot and kill C., and at the time of said shooting said H. and others were present conveniently near, and did unlawfully, willfully, and with malice aforethought aid, abet, counsel, advise, incite, and encourage said J. and B. to do said shooting and killing, H. may be convicted of murder on evidence either that he was an actual perpetrator of the act, or that he was present aiding and abetting, or that he was an accessory before the fact.

3. Criminal Law—Declarations of Conspirator—Proof of Connection with Conspiracy.—On the trial of H. for murder of C., committed pursuant to a conspiracy, evidence by the State that S. was seen at the time of the killing in company with the persons who killed C., and who were in the conspiracy, in connection with the testimony of W. that shortly prior to the visit of S. to him, in regard to killing C., H. who had spoken to him about killing C. had told him to stay at his home till H. sent for him, sufficiently connects S. with the conspiracy to make competent against H. the declaration of S. then made to W., that H. had sent to W. the money which S. then gave him, and wanted him to come that night to help kill C.

4. Same—Appeal—Rejection of Evidence—Res Gestae.—Declarations of a conspirator, made after the purpose of the conspiracy had been accomplished, not being admissible against his co-conspirators, unless competent as part of the res gestae, their rejection cannot be reviewed, it not clearly appearing how long after the commission of the crime they were made.

5. Homicide—Dying Declarations—Sense of Impending Death.—Declarations of deceased made after he was shot, from the effects of which he died the next day, "they have killed me at last," and that the shots came from a certain place, are admissible as dying declarations, they sufficiently showing that he was impressed with the fact that he could not live.

6. Criminal Law—Res Gestae—Declarations.—Testimony that witness heard the shots, saw C. during the shooting, that C. walked a few feet and fell, and witness immediately went to him, when he said they had killed him, and that the shots came from a certain place, show the declarations to be admissible as part of the res gestae.

7. Same—Declarations of Conspirators—Reference to Other Matters.—Though on a prosecution for murder of C., killed pursuant to a conspiracy, witness testified to conversations had by him with defendant and other conspirators relating to the killing of M. and C., prior to the death of either, he may not testify to conversations had with them in which the killing of M. alone was discussed, especially where M. was not killed till a year after C. was killed.

8. Same—Evidence—Inducements to Witness Not to Testify.—Testimony, on the trial of H. for murder of C., of a witness who was a party to the conspiracy to murder and familiar with its details that after the murder, and before H. was indicted, he offered witness money to leave the country and never appear or testify against him, or any of the conspirators is competent.

9. Witnesses—Contradiction.—The State may contradict the testimony of defendant in a murder case as to money which, it had been testified, he had given a witness to induce him to leave the country and not testify, the jury being admonished as to the purpose of the contradicting testimony.

(No briefs—record out of office.)

OPINION OF THE COURT BY JOHN D. CARROLL, COMMISSIONER.

The appellee, James Hargis, was put upon his separate trial under an indictment charging that: "James Hargis, Elbert Hargis, Ed Callahan, Alexander Hargis, and Jesse Spicer committed the crime of murder, as follows, viz.: That said James Hargis, Elbert Hargis, Ed Callahan, Alexander Hargis, and Jesse Spicer, in connection with Curtis Jett and William Britton, on the 24th day of January, 1905, in the County of Breathitt and State of Kentucky, did unlawfully, willfully, feloniously, and with malice aforethought, shoot and wound James Cockrill with guns and pistols loaded with powder and leaden ball and other hard substances, from which shooting and wounding the said Cockrill died in Fayette county on the following day.  (2) The said James Hargis, Elbert Hargis, Ed

Callahan, Alexander Hargis, and Jesse Spicer, to-
gether with Curtis Jett, William Britton, and other
persons unknown to the grand jury, on the 25th day
of January, 1905, and prior thereto and before the
finding of this indictment, formed and entered into a
conspiracy with each other, the purpose of which con-
spiracy was to kill and murder James Cockrill, and
pursuant thereto and in furtherance of said conspir-
acy and while the same existed, said Curtis Jett,
William Britton, and others, to the grand jury un-
known, with the knowledge and consent and by the
direction and procurement of the said James Hargis,
Alexander Hargis, Elbert Hargis, Ed Callahan, and
Jesse Spicer, on the 25th day of January, 1905, in the
county of Breathitt and State of Kentucky, did un-
lawfully, willfully, and with malice aforethought,
shoot and wound James Cockrill,  *  *  *  and the
said James Hargis, Elbert Hargis, Ed Callahan, Alex-
ander Hargis, and Jesse Spicer, before the time of
said killing, did unlawfully, willfully, feloniously, and
with malice aforethought, advise, incite, procure, and
persuade the said Curtis Jett, William Britton, and
others unknown to the grand jury, to so shoot and
wound and kill the said Cockrill, and at the time said
shooting and wounding occurred, which resulted in
the death of Cockrill as above stated, said James
Hargis, Elbert Hargis, Ed Callahan, Alexander Har-
gis, and Jesse Spicer were present conveniently near,
and did unlawfully, willfully, feloniously, with malice
aforethought, aid, abet, counsel, advise, incite, and
encourage the said Curtis Jett, William Britton, and
others unknown to the grand jury, to do said shoot-
ing and wounding and killing.'' The jury failing to
agree, were discharged, and the prosecution con-
tinued. For the purpose of having certain material
and important questions of law, that arose during the

trial, settled for the guidance of the lower court on another trial, the commonwealth, under the authority of section 335, of the Criminal Code of Practice, and Commonwealth of Kentucky v. Matthews, 89 Ky. 287, 11 Ky. Law Rep. 505, 12 S. W. 333, Commonwealth of Kentucky v. Hourigan, 89 Ky. 305, 11 Ky. Law Rep. 309, 12 S. W. 550, has brought the record to this court.

The questions we are called on to consider, involve the refusal of the lower court to give certain instructions requested by the commonwealth, and relate to errors alleged to have been committed in the admission and rejection of evidence, the first and principal question being whether or not, the evidence authorizing it, the trial judge should have instructed the jury as requested by the commonwealth, that the defendant might be convicted of being an accessory before the fact. A sharp issue is here made between the State and the accused. In brief, the commonwealth insists that, under this indictment, he might be convicted of being the actual perpetrator of the act, or as aider and abettor actually or constructively present when it was committed, or as an accessory before the fact, and there being sufficient evidence to authorize the trial judge to give the jury instructions in behalf of the commonwealth submitting for their consideration these several views, he should have done so. For appellee it is urged that, in the same indictment the defendant cannot be charged with being the principal actor, as aider and abettor, and also as an accessory before the fact; that the charges are inconsistent, one accusation being that he was present, the other that he was absent, and therefore by the common law and statute they are separate offenses. The lower court accepted as correct the view of the defense, and refused to instruct the jury that they might convict the

accused if they believed that he procured, advised, or counseled Jett or others to kill Cockrill, although absent when the crime was committed, and instructed the jury, in substance, that there could be no conviction unless Hargis was the actual perpetrator of the crime, or was present at such shooting, correctly defining his presence as follows: "Was so near to the person or persons committing it that he could give to him or them aid or assistance in doing such shooting, or could give to him or them notice of the approach of danger, or could aid him or them in escaping detec- tion or in evading or resisting arrest, and, if the defendant was in such position for the purpose on his part of giving such aid and assistance, or giving such notice, or of giving such aid and escape of protection, or of such evading or resisting of arrest, and if any of the persons who did such shooting knew, believed, or understood that the defendant was in any such position with any such purpose, this was a presence of the defendant at such shooting within the meaning of the law."

The importance of this question to the common- wealth and the accused will be more fully appreciated when it is understood that there was some evidence conducing to show that Hargis, although not the actual perpetrator of the crime, yet procured, counseled, and advised the murder of Cockrill. Whether or not he was present as an aider and abettor is a disputed question between the common- wealth and the accused—the evidence disclosing that he was in his store a short distance from the scene of the murder when it occurred. The commonwealth contends that he was there to render aid and assist- ance to the assassins, whilst the testimony for the defense tends to show that he was at the store attending to his business and knew nothing of their

murderous purpose. Under the common law a person might be guilty of the crime of murder as a principal in the first degree, the actual perpetrator of the crime, as a principal in the second degree, being present aiding and abetting the fact, as an accessory before the fact, in that, although absent at the time, the crime was committed, he yet procured, counseled, or commanded another to commit it. Blackstone, vol. 4, p. 36; Russell on Crimes, vol. 1, p. 47. Under the rules that prevailed under that system, it was always important for the prosecution to keep clearly in mind the technical distinction between the various degrees of the same crime. It is not necessary here to describe with more fullness the common-law procedure in the indictment and prosecution of aiders and abettors and accessories. Elaborate accounts that have now little more than historical value can be found in Hale's Pleas of the Crown, Russell on Crimes, and other standard authorities. Happily for the just and correct administration and enforcement of the law, and the protection and security of persons and property from the violence or viciousness of the criminal classes, the shadowy and confusing technicalities and distinctions of the common law have been supplanted by the simpler and more intelligent expressions of modern law as found in codes and statutes. It is scarcely necessary at this point to add that the common-law definition of those crimes that are punishable under the statute, although not described in it, must be followed, as in murder, burglary, and other offenses mentioned, but not defined, in our statute. But, when the offense is both created and described by statute, the common law as to it is abrogated, but when the punishment for a common-law offense is prescribed by statute, it is exclusive. Ky. Stats., 1903, sec. 1127. It may in fact be said

that the change has been more radical in the practice and procedure than in the description or definition of crime. Our statute does not create or describe the crime of murder, nor does it mention aiders and abettors or principals in the first or second degree. It merely fixes the punishment for murder. Nor does it define the penalty that shall be visited upon an accessory before the fact, but does make a radical change in the common law in the respect that an accessory may be tried and convicted although the principal has not been, providing in section 1128 that: "In all felonies accessories before the fact shall be liable to the same punishment as principals, and may be prosecuted jointly with principals, or severally, though the principal be not taken or tried, unless otherwise provided in this chapter." Therefore, it may safely be declared as the law in this commonwealth that the principal actor, the aider and abettor, and the accessory before the fact are all principals in the first degree and equally guilty, and may be so accused and convicted. The Constitution, in section 11, provides that "in all criminal prosecutions the accused has the right * * * to demand the nature and cause of the accusation against him," and, carrying out the central idea expressed in this wise provision, the Criminal Code of Practice in section 122, declares that an indictment shall contain: "A statement of the acts constituting the offense in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended, and with such degree of certainty as to enable the court to pronounce judgment on conviction according to the rights of the accused." And in section 126 it is laid down that: "An indictment except in the cases mentioned in the next section, must charge but one offense, but if it may

have been committed in different modes and by different means, the indictment may allege the modes and means in the alternative." Under the latter section, although the indictment can charge only one offense, with the exceptions saved, the pleader is at liberty to describe the offense charged in as many different ways as may be necessary to present his case, keeping always in mind that the description of each mode and means of its commitment must be sufficient to give the accused full information of the crime charged, so that he may be prepared to meet it. In harmony with this rule of law it has been announced in a number of cases that in the same indictment a person may in one count be charged as a principal actor, and in another with being present aiding and abetting in its commission. Howard v. Commonwealth, 110 Ky., 356, 22 Ky. Law Rep., 1845, 61 S. W., 756; Cupp v. Commonwealth, 87 Ky., 35, 9 Ky. Law Rep., 877, 7 S. W., 405; Mulligan v. Commonwealth, 84 Ky., 229, 8 Ky. Law Rep., 211, 1 S. W., 417; Stricklin v. Commonwealth, 83 Ky., 566; 7 Ky. Law Rep., 627; Benge v. Commonwealth, 92 Ky., 1, 13 Ky. Law Rep., 308, 17 S. W., 146; Taylor v. Commonwealth, 90 S. W., 581, 28 Ky. Law Rep., 821.

It is, however, earnestly insisted by able counsel for the appellee that, although it is competent to charge in the indictment that the accused was the principal actor, and also an aider and abettor, as both imply the actual or constructive presence of the accused, he cannot further be charged as an accessory before the fact, because that necessarily imports his absence when the crime was committed, and consequently the accusations are radically different, and do not afford the defendant the accurate information of the accusation against him to which he is entitled under the Constitution and laws. In support of this

position, our attention is called to the case of Able v. Commonwealth, 5 Bush, 698, as conclusively settling this question. The facts of that case were that Able was indicted and convicted of the offense of grand larceny. The evidence established that Able lived about two miles from Gibson—the person whose property was stolen—and that Able procured a young man who lived with Gibson to commit the theft, which he did, delivering the money to Able at his place of residence some distance away. The court held that Able, under the indictment charging him with being the principal actor, could not be convicted of being an accessory before the fact, which in truth he was. There is, however, a marked distinction between that case and the one at bar. There, the indictment did not comply with the constitutional and statutory provisions cited, as it failed to inform Able of the facts under which a conviction would be sought. Under the indictment before us, a man of common understanding cannot read it without being fully advised of the charges that he will be called on to answer. The accused was notified by it that he was charged with the murder of Cockrill: (1) By actually committing the act. (2) With having entered into an arrangement or conspiracy with Jett and others to murder him, and that, while the conspiracy existed, they did by his counsel and procurement and with his knowledge, commit the act. (3) That he advised and encouraged Jett and others to perpetrate the crime, and, at the time of its commission, was conveniently near and aiding and abetting in its commitment. It is true that the statuate yet preserves the technical crime of accessory before the fact, but it has been stripped of the confusing distinction of the common law. In fact, as admirably put by Bishop in his new Criminal Law,

section 673: "This distinguishing of the accessory before the fact from the principal is a pure technicality. It has no existence either in natural reason or the ordinary doctrines of law, for in natural reason the procurer of the crime is not chargeable differently from the doer. And a familiar rule of the common law is that what one does through another's agency is regarded as done by himself. Likewise, in morals there are circumstances wherein we attach more importance to the accessory before the fact than to his principal. We can only conjecture how this distinction came into law—probably from the same confused apprehension whence sprang the now exploded distinction between principals and accessories at the fact. Having, however, become established as a technical rule, it cannot be removed by the courts. Still, since this distinction has no foundation in reason, our judges are permitted to extend it no further than compelled by the authorities." And in Stricklin v. Commonwealth, 83 Ky. 566, 7 Ky. Law Rep. 627, this court ruled that there was practically no distinction between accessories before the fact and principals and, in effect, that a person in the same indictment might be charged as an accessory and as principal—holding: "In the commission of the offense of murder, there may be an accessory before the fact as well as a principal, but both are in law guilty of the offense, and by our statute their punishment is made the same. But whether the person charged with the offense of murder be guilty as principal or accessory, depends upon the particular circumstances of the offense charged; that is, whether he, being present, actually committed the crime, or aided and assisted in committing the homicide, or not being present, with felonious intent incited, procured or advised it. It was, therefore, not a departure from the rules of

pleading prescribed by the Criminal Code to denomi-
nate the offense with which the appellant was charged
in the indictment, as murder.'' It is true that, under
an indictment charging the accused merely as an
accessory before the fact, he could not be convicted
as the actual perpetrator of the crime, because the
indictment would not advise him, as required, of the
accusation against him, or prepare him to meet
fairly the prosecution, and so, under an indictment
charging one with being the perpetrator of the act,
he could not be convicted on evidence that he was an
accessory. But when, in an indictment for murder
against two or more persons, it is alleged that the
crime was committed in pursuance of an agreement,
arrangement, or conspiracy, it may charge the
accused as being the actual perpetrators of the act,
also as being aiders and abettors in its commission,
and as being accessories before the fact in procuring,
advising, and counseling its commission, and under
such an indictment, the evidence authorizing it, the
accused may be convicted as the actual perpetrator
of the act, or as being actually or constructively pres-
ent as an aider or abettor, or as having counseled,
advised, and procured its commission, although
absent or present but not as an aider or abettor
when it was committed. This conclusion seems neces-
sarily to follow from the proposition that the aider
and abettor and the accessory before the fact are
principals in the commission of the crime equally
with the actual perpetrator of the deed, and punish-
able in the same manner. Therefore the indictment
before us only charges one offense, that of murder.
But as authorized by section 126 of the Criminal
Code of Practice, it is described as having been com-
mitted in different modes and by different means.
The trial judge, the evidence authorizing it, should

have instructed the jury that they might find the accused guilty as the actual perpetrator of the act, or as an aider and abettor, or as having counseled or procured the commission of the crime although absent when it was committed, or even present but not as an aider and abettor.

The errors in the admission and rejection of testimony may be briefly disposed of. Anse White, introduced as a witness for the commonwealth, testified, in substance, that in March, 1902, Hargis gave him a pistol and told him to go to the courthouse and if any trouble came up there to kill Cockrill, Cox, and others. Soon afterwards, White returned the pistol to Hargis who told him to go to his home and stay there until he sent for him. White was then asked if, shortly after this conversation with Hargis, any person came to see him, and if so, to relate what the person said. The avowal made shows that the witness, in answer to the question, would have testified, if permitted so to do, that, a short time after he left Hargis, Asbury Spicer came to his home and gave him a roll of money which he said had been sent him by Jim Hargis and Ed Callahan, and that they wanted him to come to Jackson that night to help, in connection with Jesse Spicer and others, kill Dr. Cox or Jim Cockrill, or both, but that he returned the money to Spicer and refused to go or have anything to do with the matter, and a very short time after that Dr. Cox was killed. Previous to the offer to introduce this evidence, the commonwealth introduced witnesses who testified that they saw Asbury Spicer in the courthouse upstairs in the room from which Cockrill was shot. There is no evidence that Spicer ever had any conversation with Hargis or any of his codefendants in regard to the killing of Cockrill, or that he had ever been seen in the presence

of any of them, nor was he indicted.  It is the con-
tention of the commonwealth that Spicer's con-
nection with the conspiracy to murder Cockrill was
sufficiently established by the evidence that he was
seen about the window or place where the persons
who killed Cockrill were stationed to warrant the
inference that he was a member of the conspiracy,
and therefore his declarations were competent
against his co-conspirators.  The admission of evi-
dence of this character depends on whether or not
the evidence preceding it has connected the declarant
with the conspiracy in such a way as to make his
declarations competent against his co-conspirators.
All conspiracies must necessarily be established
largely by circumstantial evidence; indeed, we might
say by a series of facts and circumstances.  There is
little difficulty in laying down the law applicable to
the declarations and acts of a conspirator in further-
ance of, and made with reference to, the conspiracy.
The trouble arises when it is attempted to apply the
law to the facts.  In Greenleaf on Evidence, vol. 1,
sec. 111, it is said:

"Declarations of conspirators in regard to the
common design are competent when a foundation has
been laid by proof sufficient to establish prima facie
the fact of conspiracy between the parties or proper
to be laid before the jury as tending to establish
such fact.  The connection of the individuals in the
unlawful enterprise being thus shown, every act and
declaration of each member of the confederacy in
pursuance of the original concerted plan and with
reference to the common object is in contemplation
of law, the act and declaration of them all, and is
therefore, original evidence against each of them.
It makes no difference at what time any one entered

into the conspiracy. Every one who does enter into a common purpose or design is generally deemed, in law, a party to every act which had before been done by the others and a party to every act which may afterwards be done by any of the others in furtherance of such common design." Powers v. Commonwealth, 110 Ky., 386, 61 S. W., 735, 22 Ky. Law Rep., 1807, 53 L. R. A., 245. And in Wright on Criminal Conspiracies, page 216, it is said: "Nor is responsibilities for the acts of co-conspirators limited to the acts of those indicted, for there may be members of a conspiracy outside of the jurisdiction of the trial court but whose participation in the work of those on trial makes proof of their acts admissible to charge the defendant." Therefore, when the commonwealth introduced evidence showing that Asbury Spicer was seen in company with the persons who killed Cockrill, at the time the fatal shots were fired, and who were in the conspiracy, this, in connection, with White's testimony, that previous to the visit of Spicer, Hargis had told him that he would send for him when he wanted him, and shortly thereafter Spicer came to see him for the purpose before stated, sufficiently connected him with the conspiracy to make competent against his co-conspirators declarations made by him previous to the murder.

Blanton, a witness for the commonwealth, testified that he was in the street near the courthouse when the shooting began, and immediately afterwards ran to the courthouse for the purpose of ascertaining who fired the shots; that, when he got to the courthouse door he saw Curtis Jett, Jesse Spicer, and Bill Britton, the two former standing in the front door of the courthouse, Jett with his pistol in his hand. He was asked what Jett said, and the avowal was made that Jett's reply was: "This is the thing that

laid him on the cooling board.  I will now go across the street and see my relatives"—and that Jett then crossed the street to the store of Hargis.  It does not clearly appear how long after the fatal shots were fired this declaration was made.  When it was made, the object of the conspiracy had been accomplished, and Jett had left the place from which the shots were fired, and therefore the declarations of Jett were not competent against his co-conspirators, unless they can be admitted under the res gestae rule.  Although it is well established that the acts or declarations of a conspirator are not admissible against his co-conspirator after the purpose of the conspiracy has been accomplished, yet, if they are so near the time of its accomplishment as to be a part of the act itself, and not mere narratives of past events, they will be competent as a part of the res gestae.  We are not prepared to say that the trial judge did not correctly reject this evidence, as it does not satisfactorily appear that it was near enough to the act of killing to be a part of it, and therefore admissible.

Bowling, who was near Cockrill when he fell, and immediately went to him, was asked what Cockrill said.  The avowal is made that he would testify if permitted that Cockrill said:  "Oh, Bowling, they have killed me.  Oh Lord, they have killed me at last."  That he then asked Cockrill who killed him, and he said:  "I don't know, but the shots came from the courthouse window."  Cockrill was fatally wounded, and died on the following day.  The evidence does not show whether or not Cockrill knew his condition, and therefore it is urged that the evidence was incompetent as a dying declaration, as these declarations are only admissible when made under a sense of impending dissolution.  The question

is, is a statement made immediately after a person has been fatally wounded competent as a dying declaration when the evidence does not show that he knew that his wounds were fatal. In Peoples v. Commonwealth, 87 Ky., 487, 10 Ky. Law Rep., 517, 9 S. W., 509, 810, this court said: "The law does not require as a condition to the competency of a statement as a dying declaration that the injured party shall in express words declare that he knows that he is about to die, or that he shall make use of equivalent language. His recognition of impending dissolution may be shown in this way, but the law does not limit it to this mode alone." Evidently Cockrill was impressed with the fact that he could not live, as he exclaimed: "They have killed me at last." He, in fact, died the next day, and there is not the slightest suggestion that, when the statement was made, he had any hope of recovery. We are of opinion that his declaration under the circumstances was competent as a dying declaration. Commonwealth v. Matthews, 89 Ky., 287, 11 Ky. Law Rep., 505, 12 S. W., 333; Green v. Commonwealth, 18 S. W., 515, 13 Ky. Law Rep., 897; Baker v. Commonwealth, 106 Ky., 212, 50 S. W., 54, 20 Ky. Law Rep., 1778. Aside from the competency of this evidence as a dying declaration, it was admissible as a part of the res gestae. The witness Bowling testified that he heard the shots, saw Cockrill during the shooting, and that Cockrill walked a few feet and fell, and immediately the witness went to him, when the statement above mentioned was made. The rule as to the admission of statements as a part of the res gestae is correctly stated in American & English Encyclopedia of Law, vol. 24, page 680, as follows: "The declaration of the deceased as to the cause and circumstances of the homicide will not be admissible if

they are made at such a time subsequent to the occurrence of the main facts in issue, and under such circumstances as clearly render them mere narratives of past event, but the great weight of authority is that the true test of the competency of the evidence is not whether the declarations were made after the act of homicide was done, but they will be admissible as part of the res gestae if made after the lapse of so brief an interval, and in such connection with the principal transaction, as to form a legitimate part of it, and to preclude the presumption that they are the result of premeditation and design." And this statement of the law is fully supported by Greenleaf on Evidence, vol. 1, sec. 126, and Wigmore on Evidence, vol. 3, sec. 1745; Norfleet v. Commonwealth, 33 S. W., 938, 17 Ky. Law Rep., 1137; Hughes v. Commonwealth, 41 S. W., 294, 19 Ky. Law Rep., 497.

Mose Feltner testified as to a conversation he had with the accused and other conspirators relating to the assassination of Marcum and Cockrill previous to the death of either of them. The commonwealth also offered to prove by him that he had other conversations in which the killing of Marcum, but not Cockrill was discussed. What occurred in these latter conversations when the name of Cockrill was not mentioned, the trial judge rejected, and properly so. The accused was on trial for the killing of Cockrill, and statements made by him in respect to Cockrill were admissible, but conversations had, however wicked their intention or murderous their purpose, were not competent unless they related or referred in some way to Cockrill. Especially is this true in view of the fact that Marcum was not killed until May, 1903, Cockrill being murdered in July, 1902. This witness was inquired of at length concerning conversations with Hargis, and the execution of a

note and payment of money by Hargis to him in 1904, some two years after Cockrill was killed and before Hargis was indicted for his murder. The evidence of this witness discloses that he had frequent conversations with Hargis in regard to the murder of Cockrill, and was fully acquainted with, and advised of, all the plans and arrangements made for it. And that in 1904 Hargis said to him, mentioning the Cockrill case, that he, Hargis, would give witness several hundred dollars provided he would leave the country and never appear or testify against Hargis or any of the conspirators. This evidence was competent. Its weight and sufficiency was for the jury. Feltner was a party to the conspiracy, familiar with its details, and therefore a material witness against Hargis in the event of prosecution, and, if Hargis, with a view of depriving the commonwealth of his testimony, offered to pay him to leave the State and not appear as a witness, his statements as to what Hargis said in connection with the payment of the money was entirely competent, and the lower court properly permitted it to go to the jury.

Complaint is also made that minor errors were committed in the admission of evidence, relating to the note and check given Feltner. The court permitted several witnesses to contradict the testimony of Hargis respecting this transaction. The evidence concerning this note and check was very material to the commonwealth, and hence damaging to the accused, and it was permissible for the commonwealth to contradict, if it could, the material statements of Hargis made with reference to this transaction, admonishing, of course, the jury of the purpose for which the evidence was admitted.

This opinion will be certified to the lower court as the law of this case.