## Alsop v. Commonwealth.

(Decided April 16, 1915.)

### Appeal from Scott Circuit Court.

Wills—Dying Declarations—When Admissible as Evidence.—It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the dying declaration admissible as evidence. If it appears that the deceased, at the time of the declaration, had any expectation or hope of recovery, however slight it may have been, and though death actually ensued an hour afterwards, the declaration is inadmissible. On the other hand, to render such a declaration competent, it is not necessary to show that the declarant, at or prior to the time of making it, expressly declared he knew he was about to die, or made use of equivalent language manifesting such belief. The essential preliminary fact to be established in order to render the declaration competent, is that it was made under a consciousness of impending death; and whether this be so or not, may be determined, not only by what the declarant may say, but by his evident danger and by all the surrounding circumstances.

LLEWELLYN F. SINCLAIR for appellant.

JAMES GARNETT, Attorney General, for appellee.

Opinion of the Court by Judge Settle—Affirming.

The appellant, Alex. Alsop, was indicted by the grand jury of Scott County for the crime of murder, committed by his shooting with a shotgun and killing Charles Parish. The trial resulted in a verdict finding him guilty of murder and fixing his punishment at confinement in the penitentiary for life. From the judgment entered upon this verdict he has appealed.

Briefly stated, the facts respecting the homicide were as follows: On the day of the shooting the deceased went to the home of Claude Rogers, in Scott County, and found, in a cabin in Rogers' yard, the appellant, Andrew Taylor, Gus Clark, and Will Bell engaged in a game of cards for amusement. The deceased immediately took the place of Taylor in the game, the latter having quit it for the purpose of going to the house of Mr. Rogers to replenish the fire. A dispute arose between deceased and appellant over the game, in the course of which each called the other a liar. Upon deceased's grabbing a hammer appellant was pushed out of the cabin by Gus Clark. According to the testimony of appellant, Clark and Bell, deceased said he would kill appellant before the sun went down. This statement was not heard by Taylor, who was then in the house of Mr. Rogers attending to the fire. After being pushed out of the cabin by Clark appellant started for his home, and shortly thereafter deceased left for his home, in reaching which he had to pass near the home of appellant. When near appellant's home the latter came out of his house with a shotgun and upon meeting deceased in an adjoining cornfield shot him. The wound thereby inflicted was in the deceased's shoulder and caused blood-poisoning, and, a few days later, his death.

The only eye-witnesses who gave testimony as to what occurred at the time of the shooting were the slayer and his victim. According to the testimony of the former, about the time he reached his home, after leaving Rogers', he looked back and saw deceased coming behind him, and that upon his reaching his yard fence deceased called him; that he did not then stop, but walked on into his house, got his gun, came out in the yard and stated to deceased that he had treated him wrong, and that he had done nothing to deceased; that deceased thereupon said, "G— d— you, that is not all I am going to do; I intend to kill you," putting his

hand in his pocket, as if to get a weapon; seeing which, appellant shot deceased and the latter turned and went away.

It will be seen from a dying statement made by the deceased and reduced to writing by M. Fleming, a deputy sheriff of Scott County, the day before his death, that his version of what occurred at the time of the shooting radically differed from that of appellant. The statement in question is as follows:

"I, Charles Parish, realizing that I am about to die, make this my dying statement of the shooting of myself by Alex Alsop.

"We were playing cards for fun at the house of Claude Rogers. We were ratting one another. Gus Clark was my partner. Had a dispute over the game. I called Alex a damned liar and he called me the same. Gus pushed Alex out of the door and Will Bell pushed me back in the house. Alex left for home. I started home and got on top of the hill, saw Alex going into his house. When I got in the cornfield, heard Alex's wife screaming and running after him, trying to get him to come back. When I saw the gun, I started to run. He said: 'Come here, Charlie, I would not hurt a hair in your head.' I stopped and went back toward him. He shot me. After he shot me, he loaded his gun and started after me. I was running from him. When I got to the fence my arm was hanging to my side. I fell over the fence. I was about one hundred yards from him when he called me to stop. He run and cut me off from home. If he had not told me he would not hurt me I could got away. Alex's wife was following him, begging him to come back. We had always ratted each other that way and did not think of any trouble.

"Witnessed and signed before me in the presence of Ed Smith, D. W. Jackson, and M. Fleming, this 5th day of February, 1913.

his

Charley  X  Parish."

mark

John Rogers, a witness for the Commonwealth, testified that he went into the cornfield where deceased claimed to have been shot, the day following the shooting, and there found the tracks of two persons close together and near the fence between the homes of appellant and deceased; that at the point where the tracks

were seen he observed mud on some cornstalks and found some pieces of clothing that looked like the goods of which the coat worn by deceased at the time of the shooting was made.

Three grounds were relied on by appellant for a new trial, but as two of these have been abandoned by him, it will only be necessary for us to consider the remaining one, which is alone urged for a reversal of the judgment of conviction; that is, that the trial court erred in admitting as evidence the dying declaration of the deceased referred to; it being his contention that it is not apparent from the evidence that the circumstances attending the making of the declaration were such as to show that it was made *in extremis* and under a sense of impending death.

The evidence furnishes no basis for this contention. The dying declaration was obtained by the sheriff of Scott County and his deputy at the instance of the Commonwealth's Attorney, after he and they had been advised by the deceased's attending physician that he could not recover. The sheriff and deputy testified, in substance, that they visited deceased at his home and upon reaching his bedside the sheriff said to him that the physician had told them to inform him that he could not get well and would live but a few hours; that, as he had to die, if he wished to make a statement in regard to the shooting he had better do it; that upon receiving this information deceased said, in substance, that the doctor ought to know, and as he said he was bound to die, he desired to give the statement, and at his request the statement was then reduced to writing by the deputy sheriff, as dictated by the deceased, and upon its completion was read to, approved and signed by him, and then attested by the witnesses whose names appear thereto. According to the further testimony of the sheriff and deputy, while the information given deceased by them as to the certainty and nearness of his death appeared to somewhat startle him for a time, he did not question its truth, readily expressed his willingness to make the dying statement and was entirely conscious and composed at the time of making it.

The deceased lived but a day after making the foregoing declaration, and from the time he was informed by the sheriff of the physician's advice that he had but a few hours to live, down to his death, nothing was said

or done by him which conduced in the slightest degree to show that he hoped or expected to recover. On the contrary, his conduct manifested his belief and acquiescence in the truth and finality of the physician's judgment and advice.

We think the ruling of the trial court in permitting the introduction of the dying declaration justified by the circumstances attending the making of the statements therein contained, and also by the authorities furnishing the rule by which the admissibility of such evidence is to be determined. That rule is thus stated in Greenleaf on Evidence, Vol. I., Section 158:

"It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. Therefore, where it appears that the deceased, at the time of the declaration, had any expectation or hope of recovery, however slight it may have been, and though death actually ensued an hour afterwards, the declaration is inadmissible. On the other hand, a belief that he will not recover is not of itself sufficient, unless there be also the prospect of almost immediate dissolution."

In Wigmore on Evidence, Vol. 2, Section 1442, the rule is thus stated:

"In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances. It has been contended that only the statements of the declarant should be considered for this purpose; or, less broadly, that the nature of the injury alone could not be sufficient, i. e., in effect, that the declarant must have shown in some way by conduct or language that he knew he was going to die. This, however, is without good reason. We may avail of any means of inferring the existence of such knowledge; and if in a given case the nature of the wound is such that the declarant must have realized his situation our object is sufficiently attained. Such is the judicial attitude. * * * No rule can here be laid down. The circumstances of each case will show whether the requisite consciousness existed; and it is a poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances."

In Arnett v. Commonwealth, 114 Ky., 593, this court said:

"To render the statements of a person admissible as dying declaration, such person need not in express words declare that he is about to die, or make use of equivalent language. The essential preliminary fact to be proven to render it competent is that they were made under a consciousness of impending death; and this may be determined not only by what he declares on the subject, but also by his evident danger and surrounding circumstances."

In Eversole v. Commonwealth, 157 Ky., 478, we again said on this subject:

"To make such a statement as that coming from the deceased admissible as a dying declaration it must be made when the party is *in extremis,* and has given up all hope of this life; but whether this be so or not may be determined, not only by what he may say, but by his evident danger and by all the surrounding circumstances. The injured party need not in express words declare that he knows he is about to die or make use of equivalent language."

Tested by the rule as thus announced by the authorities, *supra,* we are clearly of opinion that the statements made by the deceased, contained in the paper introduced in evidence, were made under a sense of impending death and that what he then said not only showed his consciousness of that fact, but also his consciousness as to what he was saying about the transaction, whether true or not. This conclusion is further sustained by the following additional authorities: Peoples v. Commonwealth, 87 Ky., 487; McHargis v. Commonwealth, 15 R., 323; Pennington v. Commonwealth, 24 R., 321; Jones v. Commonwealth, 20 R., 325; Terrell v. Commonwealth, 13 Bush, 246; Baker v. Commonwealth, 106 Ky., 212; Begley v. Commonwealth, 154 Ky., 30; Daniel v. Commonwealth, 154 Ky., 601.

The authorities relied on by appellant's counsel are not in conflict with those we have cited. They are cases in which the dying declarations were held inadmissible because the circumstances under which they were made did not bring them within the rule as announced in this opinion and in the authorities therein cited in support of the rule.

The jury evidently accepted the statements contained in the deceased's dying declaration as to what occurred at the time he was shot by appellant, as the

truth of the matter. This it was their province to do, and we cannot, without invading that province, say that they should have accepted the testimony of appellant as to what then occurred, instead of that furnished by the dying declaration of the deceased. In other words, as to the question of appellant's guilt we are concluded by the verdict, and as the jury were properly instructed on the law of the case, and the record discloses no prejudicial error, the judgment is affirmed.